IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| CORRIS DAVIS, | ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 13 C 3971 |
| Plaintiff, | | Judge Virginia M. Kendall |
| v. | | |
| MICHAEL LEMKE, *et al.*, | | |
| Defendants. | | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Corris Davis, a former inmate of the Cook County Jail ("CCJ") and the Illinois Department of Corrections ("IDOC"), originally filed this 42 U.S.C. § 1983 action against his former medical providers alleging that they violated his civil rights by acting with deliberate indifference to his serious medical needs related to his ear pain, hearing loss, and ringing in his ear. Davis subsequently dismissed his claims against all of the medical providers[1] with the exception of Dr. Vipin Shah. Shah now moves for summary judgment arguing that he did not act with deliberate indifference. For the following reasons, Shah's Motion for Summary Judgment [181] is granted.

**BACKGROUND**

**A.     The Parties**

Corris Davis is currently a forty-six year old inmate who has been in and out of CCJ and IDOC correctional institutions. (Dkt. No. 190 at ¶ 5.) He was most recently incarcerated at CCJ followed by a period of incarceration at IDOC for a burglary charge. (*Id.*)

---
[1] On May 11, 2016, Davis voluntarily dismissed Dr. Saleh Obaisi, Dr. Andrew Tilden, Nurse Practitioner Angel Rector, and Pinckneyville Correctional Center's Health Care Unit Administrator Christine Brown. (Dkt. No. 179.)

1

Dr. Vipin Shah is currently the medical director at the Pinckneyville Correctional Center. (*Id*. at ¶ 6.) He earned his medical degree in India, moved to the United States in 1973, and began working as a medical director in IDOC in 2000. (*Id*.) He has worked as a medical director at Western, Jacksonville, Vandalia, Graham, and Lincoln Correctional Centers, and became the medical director at Pinckneyville in 2011. (*Id*.)

**B.     Events Prior to Davis Arriving at Pinckneyville**

Davis's relevant incarceration for this litigation began when he was arrested on June 3, 2012. (*Id*.) On June 25, 2012, during his transfer to IDOC, the prison transport bus that Davis was on was hit by a semi tractor-trailer truck. (*Id*. at ¶ 36.) The right side of Davis's head struck the bus's window frame and the left side of his head hit the shoulder of an inmate sitting next to him. (*Id*. at ¶ 37.) The CCJ officials took Davis to Cermak Hospital immediately after the crash where the staff determined that he was suffering from a mild headache. The staff noted that Davis did not have any signs of swelling, tenderness, or deformity. (*Id*. at ¶ 38.)

Davis first began experiencing hearing loss and ringing in his ears immediately after the June 25 crash. (*Id*. at ¶ 39.) Davis told the Cermak medical staff about his hearing loss – and that his hearing loss was exacerbated by the ringing in his ears – but Cermak's medical notes make no mention of hearing loss or injury to Davis's ears. (*Id*.) After he was cleared by the Cermak medical staff, he was transferred to Stateville Correctional Center, where a nurse performed an intake examination. (*Id*. at ¶ 40.) The medical history from the intake examination indicated that Davis had trauma to the right side of his face. (*Id*.) On August 4, Davis saw a medical provider and complained of back pain, but did not complain of any ear or hearing-related issues. (*Id*. at ¶ 41.) On August 14, Davis was transferred from Stateville to Pontiac Correctional Center. The record from his transfer screening noted only trauma to the right-side

of Davis's face. (*Id*.) After a one month stay at Pontiac – during which time Davis did not file any medical complaints – he was transferred back to CCJ. (*Id*. at ¶ 42.) On September 24, Davis told a provider at Cermak Health Services – a non-IDOC hospital located in CCJ – that he was having difficulty hearing out of his left ear. (*Id*.) On October 5, 2012, he was again transferred to Stateville, did not make any complaints during his intake examination, and was then transferred to Pinckneyville on January 25, 2013. (*Id*.)

### C. Events at Pinckneyville Correctional Center

Upon arriving at Pinckneyville, Davis went through the intake screening process. He did not make any complaints during the intake screening and Shah was not involved in the intake screening. (*Id*. at ¶ 43.) On February 27, 2013, Davis complained to a Pinckneyville nurse about back pain related to the June 2012 accident. The nurse noted that Davis did not report any pain during the interview and had no difficulty moving. (*Id*. at ¶ 44.) On March 6, a nurse referred Davis to a higher-level provider for care after he reported stiffness in his back and mild ear pain and muffled hearing loss. The nurse did not find any objective evidence of issues with Davis's ear during the initial examination. (*Id*. at ¶ 45.) Davis did not have any contact with Shah prior to or during the March 6 appointment. (*See* Dkt. No. 192 at ¶ 1 Response; Dkt. No. 190 at ¶ 45.)

Davis first met with Shah on March 12, 2013, approximately ten months after the June 2012 accident. (Dkt. No. 190 at ¶ 46.) Davis told Shah that he was experiencing problems with his left ear and back. Shah's examination, however, revealed no apparent distress, although he did note that Davis had mild earwax. (*Id*.) Shah assessed Davis as having a questionable back injury and a questionable left ear problem because Shah's objective examination revealed no issues. (*Id*.) On March 21, Shah saw Davis for the second time because Davis said that he was experiencing leg pain. (*Id*. at ¶ 47.) Davis did not mention ear pain, hearing loss, or back pain

during the visit, and Shah subsequently ordered furthering testing for Davis's leg. (*Id*.) Shah saw Davis for the third time on April 11, though the parties dispute whether Davis complained of only back pain or whether he also raised issues regarding his ear injury. (*Id*. at ¶ 48; Dkt. No. 183-2 at 42:1-10.) A month later, on June 19, Davis complained to a nurse about neck and back pain. The nurse did not find any distress, tenderness, or swelling, but prescribed Davis with Acetaminophen and referred him to a higher-level of care. (Dkt. No. 190 at ¶ 49.) Davis did not complain of ear pain, hearing loss, or ringing in his ear during the appointment. (*Id*.)

Shah met again with Davis two days later, June 21, related to Davis's back pain and prescribed Davis pain medication even though he did not find any evidence of distress. (*Id*. at ¶ 50.) Davis did not complain of any ear or hearing related issues. (*Id*.) Davis next saw a nurse on June 27 regarding his back pain, but made no complaint regarding ear pain, hearing loss, or ringing in his ears. (*Id*. at ¶ 51.) Eight days later, on July 5, Davis saw a nurse regarding complaints of pain in his left ear, but rated the pain as zero out of ten during the appointment. The nurse prescribed Davis with Acetaminophen after finding no drainage in his ear. (*Id*. at ¶ 52.) Three days after the appointment with the nurse, Davis met with Shah on July 8. Davis complained that he had difficulty hearing out of his left ear due to the ringing in his ear, and attributed the issue to the June 2012 accident. (*Id*. at ¶ 53.) Shah examined Davis and found that Davis had no trouble hearing during the examination and that Davis's ear, tympanic membrane, ear wall, and ear wax were all "okay." (*Id*.; Dkt. No. 183-2 at 43:22-44:24). Shah ultimately assessed Davis with having questionable difficulty hearing and indicated that he wanted to conduct an audioscope test because he was unable to identify any objective findings supporting Davis's claimed hearing problems. (*Id*. at ¶¶ 53-54.) Shah submitted a request for audioscope

testing from Wexford's Utilization Management Process that same day. (*Id*. at ¶ 54.) The request was subsequently approved. (*Id*.)

On July 26, Davis told a nurse that he found blood on his washcloth, but refused medical treatment because he was scheduled to have an audioscope test a few days later. (*Id*. at ¶ 55; *see also* Dkt. No. 188 at DOC 000038.) On July 31, per Shah's order, Nurse Practitioner Rector performed the audioscope test on Davis. (Dkt. No. 190 at ¶ 56.) As part of the exam, Rector placed the audioscope into Davis's ear canal and played four sounds at different frequencies. Davis heard all four sounds in his right ear and three out of the four in his left ear, failing to respond to only a 4,000 decibel pulse. (*Id*.) Rector repeated the exam fifteen times and determined that Davis had mild hearing loss because he consistently responded to seven out of the eight frequencies. Shah reviewed the results and concluded that Davis had normal hearing aside from at the 4,000 decibel level in his left ear. (*Id*. at ¶ 57.) On September 18, 2013, after Davis complained that his left ear was bothering him, a nurse asked him whether he put anything in his ear. (*Id*. at ¶ 58.) The parties dispute whether Davis put toilet paper in his ear or whether he cleaned his ear with a washcloth. (*Id*.) The nurse irrigated Davis's ear with warm water and gave him prescription ear drops. (*Id*.) Shah examined Davis the next day, September 19, and found mild ear wax in Davis's left ear. (*Id*. at ¶ 59.) Shah prescribed pain medication and ear drops to remove the wax buildup, believing that the combination of medications would resolve Davis's complaints of ringing in his ear. (*Id*.) On October 17, Davis complained of ear pain to a nurse. The nurse noted that Davis stated that he did place a washcloth near his ear, and the nurse subsequently referred Davis to a higher-level provider. Shah reviewed the record and noted that there was nothing in the report regarding ear drainage or bleeding at the time of the examination. (*Id*. at ¶ 60.) Four days later, on October 21, Shah examined Davis regarding the latter's

5

complaints of ringing in his ear and found that Davis had mild redness and wax in the ear but that there was no swelling and his hearing was "okay." (*Id*. at ¶ 61.) After that appointment and up to January 27, 2014, Davis saw providers, including Shah, six more times for ear-related complaints. All of the examinations found questionable objective findings in support of Davis's subjective complaints, and on January 24, 2014, Rector noted that Davis was not suffering from obvious hearing loss because Davis could answer all of her questions appropriately. (*Id*. at ¶ 62.) Nevertheless, Rector referred Davis to Shah for a possible referral to an Ear, Nose, and Throat ("ENT") specialist. (*Id*.) On January 27, Shah requested that Wexford's Utilization Management Team approve a referral for Davis to see an outside ENT specialist. (*Id*. at ¶ 63.) Shah's referral request was denied on February 13 because objective examinations indicated that Davis's ears were within the normal limits and the audioscope test results were normal. (*Id*.) Shah, after prescribing Davis with ibuprofen to address his pain complaints, appealed Wexford's denial on March 17 because Davis continued to complain of ear pain. (*Id*. at ¶¶ 63-64.) The Wexford Utilization Management Team reversed its denial of the referral a week later and, on May 2, 2014, Davis was transported from Pinckneyville to Southern Illinois Health Care for the consultation. (*Id*. at ¶¶ 65-66.)

Jill Absher, the Southern Illinois Health ENT specialist, performed a physical examination of Davis's ear and found no clear signs of trauma, infection, abnormality or any other physical issues. In addition, Absher found Davis's hearing to be "grossly intact," meaning that Davis could generally hear what someone sitting in front of him was saying. (*Id*. at ¶ 66.) The examination further found no physical or other objective evidence supporting Davis's complaints of ear pain, ringing in his ears, or hearing loss. Absher testified that Davis mentioned that he found bleeding from his ear only on the date of the accident. Absher ordered a CT scan

and full audiology testing because of the lack of objective evidence.[2] (*Id.* at ¶ 67.) Two weeks later, on May 16, Davis underwent an audiology test at the ENT clinic at Southern Illinois Health. The test results indicated mild sloping to moderate hearing loss in Davis's left ear and normal hearing in his right ear. (*Id.* at ¶ 68.) The ENT clinic checked Davis's cochlear nerve function and found fluid in his ear. (*Id.* at ¶ 69.) Davis scored 100% on a Word Recognition test[3] and underwent a CT scan that came back normal, ruling out any anatomic reason for his hearing loss. (*Id.* at ¶¶ 70-71.) Absher repeated her physical exam and found unremarkable results consistent with her May 2nd exam. (*Id.* at ¶¶ 72-73.) Based on the results of the testing, Davis was diagnosed with sensorineural hearing loss to his left ear indicating that he had damage to his cochlea. (*Id.* at ¶ 74.) Absher did not attribute the nerve damage to Davis's alleged trauma, stating only that trauma could cause such harm. (Dkt. No. 183-6 at 29:7-33:17.) Instead, Absher testified that while Davis's hearing loss could have become worse due to the trauma he suffered from the June 2012 accident (though she did note the accident was probably not the cause given that it had occurred two years earlier), the deterioration was more likely due to age-related hearing loss. (*Id.* at 37:8-15.) Davis's hearing loss was rated as mild sloping to moderate in his left ear but normal in his right ear. (Dkt. No. 190 at ¶ 74.) Absher further recommended that Davis undergo an MRI in order to rule out other potential causes of his hearing loss and to see if a hearing aid would be appropriate for Davis's left ear. (*Id.* at ¶ 75.) Absher believed that Davis's hearing loss in his left ear was permanent and was a condition that had become progressively worse over time. (Dkt. No. 183-6 at 35:21-36:9.) She testified that

---

[2] Although Davis does not dispute that he did not complain of ear pain during many of his appointments with Shah, he nevertheless testified that he filed suit against Shah because he would complain about his ear pain "every time" he met with Shah. (Dkt. No. 190 at ¶ 67, Response.) That statement is inconsistent with his responses to other undisputed facts.

[3] As part of the test, Davis was presented with similar sounding words. He was able to recognize and distinguish between every word that was presented. (Dkt. No. 190 at ¶ 70.)

7

his condition had become progressively worse likely because of "age-related hearing loss" or other external facts and stated that if Davis's hearing loss was caused by trauma, his condition would probably not continue to worsen two years after the trauma. (*Id*. at 36:10-37:15; Dkt. No. 192 at ¶ 3, Answer.) Following Absher's recommendation, Shah received approval from Wexford for an MRI on May 27 and, on May 30, Pinckneyville staff scheduled the MRI for June 6. (*Id*. at ¶ 76.) However, three days prior the date of his MRI, Davis was paroled. Davis testified that he planned go to see a doctor after being paroled, but was arrested on a new burglary charge before his doctor's appointment. (*Id*. at ¶ 77.) He has been incarcerated at CCJ since June 3, 2014. (*Id*.)

## **STANDARD OF REVIEW**

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the Court's primary function is not to "evaluate the weight of the evidence or to determine the truth of the matter," but to determine whether there is a general issue for trial. *Outlaw v. Newkirk,* 259 F.3d 833, 837 (7th Cir. 2001). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation marks and citation omitted). The party moving for summary judgment bears the initial burden of production to show that no genuine issue of material fact exists. *Outlaw,* 259 F.3d at 837. This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)). Upon such a showing, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). These

facts must demonstrate that the genuine issue is material and not simply a factual disagreement between the parties.  *Id.* (quoting *Logan*, 96 F.3d at 978).  The "nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id.*

## DISCUSSION

Shah moves for summary judgment on the ground that Davis has failed to show that Shah "acted with deliberate indifference to his serious medical need or condition." (Dkt. No. 182 at 3.)  To sustain a Section 1983 claim against a defendant in his individual capacity, a plaintiff must be able to establish: (1) that he had an objectively serious medical condition; (2) that the defendant acted with deliberate indifference to that condition; and (3) that the defendant's indifference caused him an injury.  *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).  This is a conjunctive test; therefore, Davis must establish all three requirements to survive a motion for summary judgment.  *See, e.g., Higgins v. Corr. Med. Servs. of Illinois, Inc.*, 8 F. Supp. 2d 821, 828 (N.D. Ill. 1998), *aff'd*, 178 F.3d 508 (7th Cir. 1999).  Shah argues that Davis has failed to establish any of the three requirements.

A claim of deliberate indifference to a serious medical condition has an objective and subjective component.  To meet the objective component, a plaintiff must demonstrate that his medical condition is "objectively, sufficiently serious." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).  "To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quotations and citations omitted).

**I.     Objectively Serious Medical Condition**

"A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Id.* (citing *Foelker v. Outagamie County,* 394 F.3d 510, 512–13 (7th Cir. 2005)). "A prisoner's condition which, left untreated, could result in further significant injury that would be an 'unnecessary and wanton infliction of pain,' is a serious medical need." *See, e.g., Higgins*, 8 F. Supp. 2d at 828 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). Conditions that could result in permanent disablement or lingering pain are sufficiently serious medical needs. *Estelle*, 429 U.S. at 104. To meet this requirement, Davis may show that his ear pain and loss of hearing caused him significant pain, *see Cooper v. Casey*, 97 F.3d 914, 916–17 (7th Cir. 1996), substantially interfered with his daily activities, *see Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997), or otherwise subjected him to a substantial risk of serious harm. *See Farmer*, 511 U.S. 825.

Here, Shah contends that Davis's subjective complaints of pain and hearing loss, without any accompanying objective evidence, do not qualify as objectively serious medical conditions. In opposing the Motion for Summary Judgment, Davis presents three arguments. First, Davis argues that his condition was an objectively serious one based on his "repeated complaints of severe symptoms related to the extreme pain in his left ear[] and increased hearing loss." (Dkt. No. 189 at 6.) However, the undisputed facts in the record undermine Davis's position. First, Davis did not consistently complain of hearing loss or pain in his ear during his visits with Shah or other medical providers. In fact, during his medical appointments on August 4, 2012, August 14, 2012, October 5, 2012, January 25, 2013, March 21, 2013 (with Shah), June 19, 2013, June 23, 2013 (with Shah), June 27, 2013, and July 26, 2013, Davis met with medical personnel related to other issues, including back and leg pain, but did not raise any complaints related to

pain in his ear, ringing in his ear, or hearing loss. When taken in tandem with Davis's sworn testimony that he would tell medical providers about every ailment he was suffering from during every appointment, the only reasonable inference is that Davis was not, for a number of visits, suffering from any ear-condition that he believed significant enough to raise with Shah or the other medical staff. (Dkt. No. 190 at ¶ 18.) Davis's inconsistent complaints belie his argument that he was suffering from an objectively serious medical condition. Moreover, on July 5, 2013, although Davis was meeting with a nurse regarding alleged ear pain, Davis himself rated the pain level as a zero out of ten, a far cry from the claims of "severe pain" he presents now. Even when Davis did intermittently meet with Shah or other medical staff about ear-related issues, all of Shah's objective tests indicated that Davis had, at worst, mild sloping to moderate hearing loss in his left ear and completely normal hearing in his right ear, mild redness, and mild earwax buildup. (Dkt. No. 190 at ¶¶ 56-57, 68.) Shah's findings were supported by a multitude of test results that were performed by other medical professionals at offsite clinics. (*See* Dkt. No. 182 at 5.) As such, Davis's present allegations of extreme pain and ever-increasing hearing loss run contrary to the record and do not meet the objective requirement.

*Lane v. Matter*, which Shah cites to in his briefing and Davis fails to distinguish, proves instructive. 165 F.3d 32 (7th Cir. 1998). In that case, the Seventh Circuit held that the plaintiff's temporary ear pain was not an objectively serious medical condition because the only harms that the plaintiff alleged were "temporary pain he experienced during the irrigation treatment, the bleeding that, for the few days it lasted, was monitored and treated by the medical staff; and the unrelated pain later attributed to TMJ." *Id*. at *2. The Seventh Circuit reasoned that the plaintiff's injuries fell "well short" of the standard and did "not meet the requirement of deliberate indifference." *Id*. The facts are similar here. Davis cites to intermittent complaints of

non-severe pain and mild hearing loss. In fact, he scored a seven out of eight on fifteen audiology tests and 100% on a Word Recognition test. Such facts illustrate that Davis cannot meet the requisite standard. This is not to say that complaints regarding pain and hearing loss *per se* could not qualify as a serious medical condition. Indeed, if Davis had suffering from persistent pain, dealing with constant buzzing or loud ringing, or had other manifestations of harm, his complaints could meet the objectively serious standard. *See, e.g., Jackson v. Hamblin,* No. 12-CV-1035, 2014 WL 3196243, at *8 (E.D. Wis. July 8, 2014). However, those are not the established facts in the record.

Second, Davis argues that he meets the objective requirement because his medical condition was "so obvious that even a lay person would easily recognize the necessity for medical attention." (Dkt. No. 189 at 6.) Davis does not provide any specific arguments or examples in support of his position, merely asserting that he suffered a great deal of pain because of Shah's delay in treating him. (*Id.*) However, as discussed above, Davis's allegations of suffering great pain and hearing loss are undermined by the undisputed facts indicating that he suffered non-severe, intermittent pain and only mild hearing loss in one ear. In addition, nothing in the record suggests that Davis's condition substantially interfered with his daily activities or otherwise subjected him to a substantial risk of serious harm. *See Farmer*, 511 U.S. 825; *Gutierrez*, 111 F.3d at 1373. For example, although security guards at Pinckeyville routinely report if an inmate is having difficulty hearing or responding to commands and directions, the parties agree that Pinckeyville medical staff received no such reports about Davis in this case. (Dkt. No. 190 at ¶ 23.) It is also undisputed that Shah and other medical providers, including P.A. Absher and Dr. Tilden, performed numerous physical and audiological examinations on Davis but did not find any objective evidence of hearing loss or ear pain aside from Davis failing

to respond to a 4,000 decibel pulse in his left ear. Such undisputed facts undermine Davis's contention that his medical condition was so obvious that a lay-person would recognize his condition as objectively serious. *Cf. Wheeler v. Butler*, 209 F. App'x 14, 15 (2d Cir. 2006) (holding that a prisoner's hearing loss was a serious medical condition after noting evidence in the record that he was diagnosed with a severe hearing impairment and that the prison staff had reported that he was not able to function without a hearing aid).

Third, Davis contends that his ear condition was clearly an objectively serious medical condition because a CT scan "revealed" that he had suffered permanent nerve damage to the cochlea in his left ear. (Dkt. No. 189 at 6.) More specifically, Davis, citing only to a portion of ENT Jill Absher's deposition testimony, argues that he suffered permanent damage to the cochlea in his left ear and that his injury had become progressively worse prior to his first appointment with her. (*Id.*) However, as Shah points out in his briefing, the portion of Absher's testimony that Davis relies upon does not support his position. (*See* Dkt, No. 192 at ¶ 2; Dkt. No. 191 at 4.) The entirety of Absher's cited testimony is as follows:

> Q. Based on the condition [Davis] has, is it something that could get worse with time?
> A. Yes, it could.
> Q. Is it something that could have gotten progressively worse before you treated him?
> A. Yes.
> Q. And how is that?
> A. You mean from the date of the injury until when he saw me?
> Q. Yes.
> A. Oh, an age-related hearing loss. So I mean he could have had just some natural age-related versus loud noise exposure, other external factors could have affected it.
> Q. Hypothetically, if it was a trauma to his ear, it is possible that the trauma could worse over time?
> [objection made]
> A. I'm sorry, could you ask the question again?

> Q. Sure. Hypothetically, if there is trauma, if Mr. Davis did suffer a serious trauma to his left ear, and if that trauma were not treated, it is possible that his hearing could have gotten progressively worse?
> [objection made]
> A. Well, it's typically when we see trauma that causes hearing loss, if you're looking at someone two years out and it hasn't gotten worse, it's probably not going to get worse by then.
> Q. Okay.
> A. Other than age-related changes, something that would normally occur.

(Dkt. No. 183-6 at 36:4-37:15.) Nothing in the above testimony supports Davis's allegations that the CT scan revealed that he suffered permanent nerve damage to the cochlea in his left ear. (*See* Dkt. No. 192 at ¶ 2, Answer (Shah disputing Davis's assertion and noting that the CT scan was performed (unsuccessfully) to identify objective support for Plaintiff's subjective complaints).)

At the same time, Absher did testify, in other parts of her deposition that Davis does not cite to, that Davis did suffer "sensory nerve hearing loss" due to damage in his cochlea based on audiology results from a different exam. She did not, however, attribute the nerve damage to Davis's alleged trauma, stating only that trauma could cause such harm. (Dkt. No. 183-6 at 29:7-33:17.) Instead, Absher testified that while Davis's hearing loss could have become worse due to the trauma he suffered from the June 2012 accident (though she did note the accident was probably not the cause given that it had occurred two years earlier), the deterioration was more likely due to age-related hearing loss. (*Id.* at 37:8-15.) It is unlikely that a reasonable jury could find that Davis suffered from an objectively serious medical condition based on the parties' briefings and the fact that Davis fails to cite to any other evidence in the record regarding his permanent nerve damage. Nevertheless, when resolving all factual ambiguities in his favor, Davis raises a question of material fact regarding whether he suffered from an objectively serious medical condition, however questionably. *See, e.g., Zentmyer v. Kendall Cty., Ill.*, 220 F.3d 805,

810 (7th Cir. 2000) (affirming finding of objectively serious medical condition where plaintiff provided evidence that his ear infection led to permanent loss of hearing even though defendants cited "credible evidence that [plaintiff's] ear infection was mild at worst and that [plaintiff] did not sustain hearing loss.").

## II. Deliberate Indifference

Even assuming that a reasonable jury could find that Davis was suffering from an objectively serious medical condition, Davis must also establish that Shah acted with deliberate indifference towards his condition. A defendant acts with deliberate indifference where he both (1) had actual, subjective knowledge of the risk to the inmate's health, and (2) disregarded that risk. *Gayton*, 593 F.3d at 620. An official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. (quoting *Higgins v. Corr. Med. Serv. of Ill., Inc.*, 178 F.3d 508, 510 (7th Cir. 1999)). Neither negligence nor medical malpractice gives rise to a constitutional violation. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.") (quoting *Estelle*, 429 U.S. at 106). However, "[i]f a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties v. Carter*, No. 14-2674, 2016 WL 4631679, at *3 (7th Cir. Aug. 23, 2016). "One hint of such departure is when a doctor refuses to take instructions from a specialist. Another is when he or she fails to follow existing protocol." *Id*. at *4 (internal citations omitted). Other evidence that can support an inference of deliberate indifference is "an inexplicable delay in treatment which serves no penological interest." *Id*. at *5. "To show that a delay in providing treatment is

15

actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Id*.

Davis argues that Shah was subjectively reckless in his treatment of Davis's condition because (1) he continued to perform the same procedures on Davis even though he knew them to be ineffective and (2) he unnecessarily delayed referring Davis to an ENT specialist. (Dkt. No. 189 at 7.) Davis's first argument, that Shah repeated the same ineffective procedures, is rejected because the record is replete with examples of Shah altering and escalating Davis's treatment. For example, during his first appointment with Davis on March 12, 2013, Shah performed a physical examination on Davis and found that Davis had a normal ear, normal tympanic membrane, and mild ear wax. The next time that Davis complained of ear pain and hearing loss on July 8th[4], Shah again performed a physical examination, but after finding no objective evidence consistent with Davis's subjective complaints, escalated Davis's treatment by ordering an audioscope test. (Dkt. No. 190 at ¶ 54.) On September 19, 2013, Davis again met with Shah and indicated that his left ear was bothering him. Shah performed another physical exam and after finding objective evidence of mild ear wax in Davis's left ear, altered and escalated Davis's treatment by prescribing him ear drops and pain medication to remove the ear wax build up. Shah further testified during his deposition that he believed that the ear drops and pain medication would also resolve Davis's subjective complaints. (*Id*. at ¶ 59.) While this is just a small subset of all of the changes that Shah made in reaction to Davis's subjective complaints – indeed, Shah met with Davis a total of twelve times regarding ear-related issues – they bolster a finding that Shah was not simply repeating the same procedures or employing a "wait and see" treatment plan as Davis contends. (*See* Dkt. No. 189 at 1.) Nothing in the record suggests that

---

[4] Davis and Shah had three appointments between March 12 and July 8, 2013. It is undisputed that Davis did not complain of any ear-related issues during any of those appointments. (Dkt. No. 190 at ¶¶ 47-48, 50.)

Shah's ever-changing treatments were inappropriate.[5] *See Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) (denying inmate's claim of deliberate indifference where doctor "responded by prescribing new medications or changing the dosages….As far as this record shows, Dr. Fahim's choice of treatment was not blatantly inappropriate.").

Davis also asserts, without providing any meaningful analysis or argument, that Shah acted with deliberate indifference to his medical needs by refusing to refer Davis to a specialist in a timely fashion. (Dkt. No. 189 at 6.) While it is certainly the case that unnecessarily delay in responding to a medical need may establish deliberate indifference, *see Petties*, 2016 WL 4631679, at *5, the undisputed facts here show that Shah enabled, rather than delayed, Davis's appointment with P.A. Absher. As outlined above, Shah and other medical providers performed numerous physical examinations resulting in very little objective support for Davis's subjective claims of hearing loss, ringing in the ears, and ear-related pain. Based on the inconsistency between the objective results and Davis's subjective complaints, Shah himself requested that Wexford's Utilization Management Team approve a referral to an ENT specialist on January 27, 2014. (Dkt. No. 190 at ¶ 63.) The Management Team rejected Shah's request because of the negative results of the objective examinations. (*Id*.) However, due to Davis's continuing complaints, Shah *appealed* the denial of the referral and eventually received approval for Davis to see an ENT. (*Id*. at ¶¶ 64-65.) Similarly, when P.A. Absher recommended that Davis have an MRI done to rule out other potential causes, it was Shah who applied for and received approval from Wexford for the MRI. (*Id*. at ¶¶ 74-75.) The only reason that the MRI was not done was because IDOC paroled Davis from its custody three days prior to the examination date. (*Id*. at ¶ 77.)

---

[5] Notably, none of the other medical providers deposed in this case offered any criticism of Shah's treatment plan and testified that they would have taken a similar approach. (*See* Dkt. No. 190 at ¶¶ 20, 22, 24-26.)

Even assuming that Davis could persuasively argue – which he cannot – that Shah impermissibly delayed in providing Davis a referral to an ENT, Shah's medical decision to try a variety of different treatment plans before referring Davis would be entitled to deference. *See Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'"); *see also Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012); *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("Neither medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment."). Davis does not offer any evidence that Shah acted inconsistently with accepted professional standards, particularly given the fact the other medical providers testified that they would have employed a similar treatment plan. As such, based on the record, a reasonable jury could not conclude that Shah acted with deliberate indifference by delaying or in any way refusing to refer Davis to a specialist. As such, Davis fails to meet the subjective prong of the test.[6]

## **Conclusion**

For the reasons stated above, Shah's Motion for Summary Judgment [181] is granted.

Date: 9/28/2016

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

---

[6] Given the Court's finding that Shah did not act with deliberate indifference towards Davis's medical condition, punitive damages under Section 1983 are inappropriate.